IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT HUNTINGTON

SANDRA D. SAUNDERS,

        Plaintiff,

V.                                  CIVIL ACTION NO. 3:04-0610

JO ANNE BARNHART,
Commissioner of Social Security,

        Defendant.

## **FINDINGS AND RECOMMENDATION**

In this action, filed under the provisions of 42 U.S.C. §§405(g) and 1383(c)(3), plaintiff seeks review of the final decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income based on disability. The case is presently pending before the Court on cross-motions of the parties for judgment on the pleadings.

Plaintiff protectively filed her applications on February 27, 2002, alleging disability commencing May 30, 1999, as a consequence of anxiety, back pain, nerves and depression. On appeal from initial and reconsidered denials, an administrative law judge, after hearing, found plaintiff not disabled in a decision which became the final decision of the Commissioner when the Appeals Council denied a request for review. Thereafter, plaintiff filed this action seeking review of the Commissioner's decision.

At the time of the administrative decision, plaintiff was forty-three years of age and had obtained a ninth grade education and GED. Her past relevant employment experience consisted of work as a laundry attendant, housekeeper, cook and cashier. In his decision, the administrative law judge determined that plaintiff suffers from "chronic back pain," an impairment he found severe. Concluding that plaintiff retained the residual functional capacity for a limited range of medium level work and that her past work was not precluded by these limitations, the administrative law judge found her not disabled.

From a review of the record, it is apparent that substantial evidence supports the Commissioner's decision. Plaintiff testified she is unable to work due to back pain, both in the mid and low back, dizzy spells, vision loss in the left eye, right shoulder pain, anxiety and depression. The record does not reflect any treatment for dizzy spells or right shoulder problems but the administrative law judge did, generously, find that plaintiff could not climb ladders, ropes or scaffolds and had to avoid all hazards as a precaution in view of her allegation of dizzy spells. With regard to her alleged vision problems, her family physician referred her to an ophthalmologist and then to Dr. Ijaz Ahmad, a neurologist, after she complained of decreased vision in the left eye when she awoke in the morning. She also saw spots in both eyes. Findings from the ophthalmologist appeared to be papilledema[1] and optic edema, although there is not a report from him in the record. An MRI of the brain, performed on May 15, 2003, was interpreted as showing a minimal amount of abnormal signal. On neurological exam, Dr. Ahmad found no deficit and diagnosed probable

---

[1] Edema, or swelling, of the optic disc, a small circular area on the retina at the point where the optic nerve enters the eye. Attorney's Dictionary of Medicine P-43 (2005).

pseudotumor cerebri.[2] Blood work was obtained as well as an analysis of spinal fluid. At a follow-up appointment on June 20, 2003, plaintiff still had evidence of papilledema, particularly on the left side. Dr. Ahmad noted her visual fields were "grossly intact" and instructed her to continue taking the medication he had prescribed. He indicated she did not need to return for two months.

At the hearing, plaintiff stated she could hardly see out of her left eye; however, she also admitted that the removal of spinal fluid had helped her condition and that she did not have constant problems with vision impairment anymore. Rather, this seemed to occur only when she got up from lying down. The administrative law judge concluded that this evidence was not sufficient to establish that plaintiff's eye impairment was "severe." While this condition obviously could have had a significant impact on plaintiff, as noted, it clearly improved after the May 24, 2003 spinal puncture and thus did not, and was not expected to, last for twelve months.[3] The administrative law judge's findings with respect to this impairment are supported by substantial evidence.

In terms of back problems, plaintiff reported at the St. Mary's Hospital Center for Pain Relief on March 9, 2000, a primary complaint of pain in the thoracolumbar area on the left side. She also reported low back pain which occasionally radiated down the left leg. An MRI of the

---

[2] A disorder characterized by increased intracranial pressure without evidence of an intracranial space-occupying lesion, obstruction of ventricular or subarachnoid pathways, infection or hypertensive encephalopathy. Symptoms and signs include headache of varying severity and papilledema in a patient who appears otherwise healthy. Partial or complete monocular visual loss occurs in about five percent of patients, and the normal blind spots are commonly enlarged. CT and MRI scans are generally normal or show a somewhat small ventricular system. Treatment varies but when symptoms persist acetazolamide may be used, as it was here. Serial lumbar punctures to drain spinal fluid may also be effective. See, The Merck Manual, 17th Ed., Merck Research Laboratories, 1999 at 1448-49.

[3] 20 C.F.R. §§404.1509, 416.909.

lumbar spine was noted to be "unremarkable." The exam on this date revealed some tenderness on palpation of the left thoracolumbar area with "significant" spasm in the paravertebral muscles. There were no neurological abnormalities, however, and straight leg raising was negative. The impression was chronic mechanical low back pain and myofascial pain. Findings were similar on follow-up two months later.

From July 24, 2000 through March 11, 2002, plaintiff was seen at University Physicians and Surgeons where she received medication for back pain, anxiety, depression and high cholesterol. A finding of tenderness in the mid spine on September 5, 2000, was the only back abnormality noted. In fact, after October 6, 2000, back pain is not even listed as a diagnosis. Also observed is a gap in treatment from February 20, 2001 to January 22, 2002. Upon plaintiff's return, she did not complain of back pain. Just two months later, however, she reported she had quit work due to back pain, had lost her medical card and requested a letter containing an opinion she was unable to work and was eligible for medication reimbursement. While exam revealed tenderness in the left paraspinal region at the T12 to L2 levels, range of motion was full in all directions and there were no neurological deficits. Her doctor offered to write a letter stating that plaintiff needed to be off work for four weeks for treatment of back pain which would include stretching, strengthening, using heat, ice and medication, and weight loss. She was to follow-up with this physician in one month; however, as the administrative law judge pointed out, there is no indication she returned for further treatment.

Plaintiff next sought treatment at Carl Johnson Medical Center where she had previously been a patient. She was seen initially on September 10, 2002. Examination revealed increased musculoskeletal tone and pain with deep palpation in the lower lumbar area. Findings

were similar one week later when plaintiff was noted to again be requesting a letter stating she could not work. She was instructed this could not be done and that for such a letter she needed to see a "disability doctor." Plaintiff then went to the Ebenezer Medical Outreach Clinic on December 7, 2002, where exam was negative for abnormalities related to the back. She was prescribed antidepressant medication and Vioxx, both for her back, and subsequently reported some relief.

  Plaintiff was also treated for anxiety and depression beginning in December of 1999 at the Prestera Center where she was variously diagnosed with anxiety NOS, panic disorder without agoraphobia, dysthymia and generalized anxiety disorder. She terminated treatment on March 24, 2000, because she felt better and could get her medication through her family doctor. Plaintiff was described as anxious and tearful with shaking legs when seen initially at University Physicians and Surgeons on July 24, 2000. She was taking antidepressant medication and this was increased. Though she reported on September 4, 2000, that the increased dosage did not help, she asserted she did not feel depressed and had experienced fewer "crazy spells" where she became angry and sometimes threw things. On December 11, 2000, she was described as "doing well" due to changes in medication and the following month her mood was "much improved," according to her physician. Even after an eleven month absence from this facility, plaintiff, upon returning, continued to report improvement with the combination of medications she had been taking. Finally, on March 11, 2002, her doctor related these medications were controlling her depression "well" and she denied any symptoms.

  On June 10, 2002, plaintiff reported to Lisa Tate, M.A., the Commissioner's consultative evaluator, that she had a ten-year history of depression with symptoms occurring most but not all the time. Anger and easy aggravation were reported as her main problems. She was not

5

receiving mental health treatment. Ms. Tate observed a depressed mood, mildly restricted affect, intact memory, fair insight and average concentration and judgment. I.Q. testing produced a full-scale score of eighty-seven, in the low average range. Reading ability was assessed at post high school level, spelling at high school level and math at sixth grade. Plaintiff was diagnosed with a dysthymic disorder. Her daily activities included cleaning the house, doing laundry, cooking, reading one or two times per month and going grocery shopping. Her social functioning appeared fair. The reports from Carl Johnson Medical Center list a diagnosis of depression with moderate anxiety; however, no symptoms or basis for this diagnosis is indicated. The December 7, 2002, report from Ebenezer clinic contains a diagnosis of panic/anxiety disorder, but also says states that this condition was controlled with medication.

As noted, plaintiff was unable to secure opinions from her doctors that she could not work and the only assessments of residual functional capacity were those from the state agency medical advisors who found an ability to perform medium level work not requiring climbing of ladders, ropes or scaffolds or any exposure to hazards, restrictions attributable to plaintiff's complaints of dizziness. The administrative law judge found these assessments consistent with the evidence and adopted them. In considering the evidence relative to plaintiff's mental functioning, he concluded there was no impairment of daily living activities, only mild limitation of social functioning and of concentration, persistence and pace, and no episodes of deterioration or decompensation in work or work-like settings. He thus found her depression and anxiety were not

"severe,"[4] and did not assess additional limitations on her residual functional capacity. The evidence provides substantial support for these findings.

While plaintiff alleged significant limitation on her activities due to pain and anxiety, the administrative law judge, taking account of the evidence as well as his observations of plaintiff at the hearing, concluded her credibility was "poor." In this regard, he pointed out inconsistencies between her testimony as to her limitations and what she listed as daily activities. He also found that her allegations concerning the severity of her pain were inconsistent with the level of treatment she received and noted that her reports as to whether she experienced side-effects from medication were not in agreement. In view of the evidence, and taking account of the administrative law judge's "opportunity to observe the demeanor and to determine the credibility of the claimant," these findings are entitled to "great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). A vocational expert, present at the hearing, testified that plaintiff's past work as a cashier in a department store and clerk/cashier in other stores was light and unskilled as was her work as a laundry attendant. Hospital and motel cleaning work were considered medium and unskilled. After considering this testimony in light of plaintiff's residual functional capacity, the administrative law judge concluded she could still perform all of this past work, and this finding is well supported by the evidence.

Resolution of conflicts in the evidence is within the province of the Commissioner, not the courts, Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964), and if the Commissioner's findings are supported by substantial evidence this Court is bound to uphold the decision. Blalock

---

[4] Under 20 C.F.R. §§404.1520a(d)(1) and 416.920a(d)(1), ratings of this nature are generally indicative of a non-severe mental impairment, unless evidence indicates otherwise.

v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). In the present case, the evidence, though conflicting, provides substantial support for the Commissioner's findings with respect to plaintiff's impairments, residual functional capacity, and ability to perform past work. Under such circumstances, the decision of the Commissioner should be affirmed.

## RECOMMENDATION

In light of the foregoing, it is **RESPECTFULLY RECOMMENDED** that plaintiff's motion for judgment on the pleadings be denied, that the like motion of defendant be granted and the decision of the Commissioner affirmed.

Plaintiff and defendant are hereby notified that a copy of these Findings and Recommendation will be submitted to the Honorable Robert C. Chambers, United States District Judge, and that, in accordance with the provisions of Rule 72(b), Fed.R.Civ.P., the parties may, within thirteen days of the date of filing these Findings and Recommendation, serve and file written objections with the Clerk of this Court, identifying the portions of the Findings and Recommendation to which objection is made and the basis for such objection. The judge will make a de novo determination of those portions of the Findings and Recommendation to which objection is made in accordance with the provisions of 28 U.S.C. §636(b) and the parties are advised that failure to file timely objections will result in a waiver of their right to appeal from a judgment of the district court based on such Findings and Recommendation. Copies of objections shall be served on all parties with copies of the same to Judge Chambers and this Magistrate Judge.

The Clerk is directed to file these Findings and Recommendation and to mail a copy of the same to all counsel of record.

DATED: August 26, 2005

_____
MAURICE G. TAYLOR, JR.
UNITED STATES MAGISTRATE JUDGE